## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case Number: 5:13-cv-1207-JHE |
| | ) |
| UNITED CELLULAR, INC., | ) |
| | ) |
| Defendant. | ) |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff the Equal Employment Opportunity Commission ("EEOC") initiated this action against Defendant United Cellular, Inc. ("United") alleging claims of employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Doc. 1). The EEOC moved for summary judgment on its own claims on April 10, 2014. (Docs. 24 & 25). The EEOC amended its motion for summary judgment on April 18, 2014. (Docs. 26, 27, & 28). The parties have fully briefed the original and amended motions.  (Docs. 30, 31, 32, 38, 39, 41, 50, & 51). The EEOC filed a second motion for partial summary judgment as to United's affirmative defenses on May 5, 2014. (Docs. 35, 36, & 37). The parties have fully briefed the second motion. (Docs. 42, 43, 44, 53, 54, & 55). All motions are now ripe for review. For the reasons stated below, the undersigned recommends that the EEOC's original motion for summary judgment, (doc. 24), be **DENIED as MOOT** (having been superseded by the amended motion), that the EEOC's amended motion for summary judgment, (doc. 26), be **DENIED**, and

that the EEOC's second motion for partial summary judgment, (doc. 35), be **DENIED**.[1]

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-movant's favor when

---

[1] The EEOC twice asserts United admitted there are no genuine issues of material fact. (Doc. 26 at 4-5 & 21) (citing doc. 25-5 at 2). However, the cited admission merely supplements the admission of authenticity of a document by adding "United declined conciliation as there are no genuine issues as to any material facts." (Doc. 25-5 at 2). Nothing about that statement establishes the EEOC is entitled to judgment as a matter of law. It does not, as the EEOC seems to assert, admit the material facts support the EEOC being entitled to judgment as a matter of law, and it could just as easily support the opposite assertion United is entitled to summary judgment. Furthermore, to the contrary, United has presented evidence to contradict the EEOC's evidence, establishing there are, in fact, disputed questions of material fact. *See* discussion *infra*.

sufficient competent evidence supports the non-movant's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

The EEOC is the agency of the United States charged with the administration, interpretation, and enforcement of Title VII. (Doc. 1 at ¶ 3; Doc. 7 at ¶ 3). The EEOC is expressly authorized to bring this action pursuant to 42 U.S.C. §§ 2000e-5(f)(1) and (3).

Charles Embry is the charging party. (Doc. 1). In his supporting affidavit, Embry stated that he has been a practicing Seventh-day Adventist since March 2004. (Doc. 28-1 at ¶ 2). Embry's faith requires he not work on the Sabbath. (Doc. 28-1 at ¶ 5). His religion defines the Sabbath as sundown on Friday until sundown on Saturday. (Doc. 28-1 at ¶ 5).

United is a Sprint Preferred Retailer providing retail services and products to Sprint customers. (Doc. 1 at ¶ 4; Doc. 7 at ¶ 4). United operates a retail location in Huntsville, Alabama. (Doc. 1 at ¶ 5; Doc. 7 at ¶ 5). At all times relevant to this case, United was Embry's employer. (Doc. 1 at ¶ 7; Doc. 7 at ¶ 7).

According to Embry, he informed United before it hired or interviewed him that his

religious beliefs required he not work on the Sabbath, as defined by Seventh-day Adventists. (Doc. 28-1 at ¶ 6). Specifically, Embry stated that, prior to his employment, he stopped by United's store in Huntsville to have his phone repaired. (Doc. 28-1 at ¶ 6). During this visit, a United employee named Haley Vatz asked whether he would be interested in working with United. (*Id.*). In response, Embry stated he informed Vatz he would be interested but would need to be off work from sundown Friday to sundown Saturday because of his religion. (Doc. 28-1 at ¶ 8). According to Embry, Vatz told him she would ask Sami Ali, the District Manager for North Alabama, about the issue. (*Id.*). Embry testified that Vatz subsequently contacted him to say she had spoken with Ali, that having the Sabbath off would not be a problem, and that Embry should interview with Vic Vergara, then the Store Manager. (Doc. 28-1 at ¶ 9). According to Embry, he brought up his need to be off work during the Sabbath during his interview with Vergara, who responded he and Ali were already aware of the issue and a religious accommodation would not be an issue. (Doc. 28-1 at ¶ 11).

United disputes the allegation Embry informed it before his hiring he could not work on Saturdays because of his religious beliefs. (Doc. 39 at 16). Ali averred that, when United hired Embry, "he did not indicate that he could not or would not work on Saturdays" and that he was "not aware of any agreement that . . . Embry would not be required to work on Saturdays." (Doc. 41-12 at 3-4, ¶ 4). Vergara also testified that he was not aware at the time of his interview or hiring that Embry was a Seventh-day Adventist or that he needed any religious accommodation. (Doc. 41-10 at 40 & 49).

United hired Embry as a full-time Authorized Service Center Technician in July 2011. (Doc. 28-1 at ¶ 12). During his employment, Embry provided technician services to Sprint customers in the Huntsville store. (Doc. 28-1 at ¶ 13). Embry stated that, from the date of his

hiring through October 14, 2011, United accommodated his religious practices by not scheduling Embry to work on any Saturday. (Doc. 28-1 at ¶ 14).

On October 14, 2011, Store Manager Bradley Lacey informed Embry he would have to work on Saturday, October 15, because Sprint and United needed "all hands on deck." (Doc. 28-1 at ¶ 15-16; doc. 41-8 at 115-17, 127 & 147-49; doc. 41-9 at 150-52). Embry told Lacey he could not work then because of his religious beliefs and even brought Lacey a letter from his church describing Seventh-day Adventists and the observance of the Sabbath. (Doc. 28-1 at ¶ 16-17). Embry averred he also contacted Ali to discuss the issue, but Ali told him Lacey was his manager and he needed to work things out with Lacey. (Doc. 28-1 at ¶ 18-19).

Embry did not work October 15, 2011, because it was a Saturday and working on that day conflicted with his religious observance of the Sabbath. (Doc. 28-1 at ¶ 21). Following his absence, Embry stated United reduced his hours as a result of his missing work on October 15, 2011. (Doc. 28-1 at ¶ 22-24). United disputes the allegation Embry's hours were reduced as a result of his absence on October 15. (Doc. 39 at 17-18). United states all repair technicians' hours were reduced after October 15 (the date a new iPhone was released) because the demand for repairs decreased dramatically. (Doc. 41-10 at 76-77; doc. 41-8 at 120-31). A new iPhone was released on October 15, so many customers with broken phones simply opted to buy a new one instead of seeking repairs. (Doc. 41-8 at 121). Embry was the only employee at the Huntsville location who worked only in repairs; the other employees were in sales (or repairs and sales), so their hours were not affected as much. (Doc. 41-8 at 120-31). United also states that Embry had to be sent home to change into appropriate attire and was often late for work, which also naturally reduced the number of hours he worked. (Doc. 41-7 at 81-82; doc. 41-8 at 119-20).

United disputes Embry's assertion he has been a practicing Seventh-day Adventist since

March 2004 and that his belief in a Saturday Sabbath is sincere or truly held. (Doc. 39 at 12-13). Store Manager Bradley Lacey testified that he began to question whether Embry's religious affiliation was genuine shortly after Embry began working at United; Embry was working on a Friday and wanted to leave early:

> A. He wanted to leave early on Friday, and I asked him – you know, he wasn't explaining himself. So I asked, you know – he said, "I can't be here. I have to leave. I can't be here at sunset."
>
> I didn't know what he was talking about. And I said, "Why can't you be here at sunset?" He said, "The Sabbath, the Sabbath." And I said, "When is sunset?" And he gave a blank stare as if he didn't know. And I said, "Do you know when sunset is?" And he didn't give me a response. And I told him to look it up. Because at this time, it's the middle of the day.
>
> . . . I went to the other room and I came back and I said, "Did you find out when sunset is?" And he didn't say anything.
>
> So we got on the computer and looked it up. And that day sunset was – it was 6:01, something – it was after 6:00. And when we were having this conversation, it was around about 3:00 . . . .
>
> Q. Did he finish his workday that day?
>
> A. No. He left early. . . . . He was allowed to leave before sunset, but since he didn't know in that instance when sunset was, I started wondering, you know, he doesn't know – it was as if he was new to the religion, and he didn't know about the religion.

(Doc. 41-6 at 19-21; *see also* doc. 41-8 at 147-48). Additionally, Lacey testified Embry worked for a nursing home on Friday evenings and Saturdays, contrary to Embry's professed religious observance of the Sabbath. (Doc. 41-6 at 23-25; doc. 41-8 at 134-39).

To help explain his professed religion, Embry enlisted the assistance of Kevin James, the Associate Director of the Southern Union Conference Department of Public Affairs and Religious Liberty, an organization affiliated with the Seventh-day Adventist religion. (Doc. 28-1 at ¶ 27). On November 3, 2011, James mailed a letter to Lacey describing the Seventh-day Adventist religion and the work restrictions related to observance of the Sabbath. (Doc. 28-1 at ¶ 28).

On at least one occasion, Embry stated he asked Lacey about switching schedules with another United employee to accommodate his religious beliefs. (Doc. 28-1 at ¶ 35). Lacey refused Embry's request to swap schedules with another employee. (*Id.*). Lacey testified Embry had been accommodated every time he requested it, even for days that were not his Sabbath. (Doc. 41-7 at 98-101; doc. 41-8 at 127-29 & 147-49). Lacey also testified that, in terms of swapping schedules, the store was sales-only on Sundays and Embry was the only employee in the Huntsville store who was not cross-trained to handle sales in addition to repairs, both of which made schedule swaps challenging. (Doc. 41-8 at 121-25).

United subsequently scheduled Embry to work until 6:30 p.m. (after sundown) on Friday, December 2, 2011. (Doc. 28-1 at ¶ 30-31). Embry would have known about his schedule at least by the Friday before (November 24), but he did not express any problems with the schedule prior to December 2. (Doc. 41-8 at 127-29). Embry reported to work on December 2; however, he says he attempted to contact Ali to inform Ali he would need to leave prior to 6:30 p.m. in observance of the Sabbath. (Doc. 28-1 at ¶ 31). Embry sent Ali a text message at approximately 4 p.m. on December 2: "Sami. The Sabbath is very important to me. I am going to leave. It is better to follow God then [sic] to burn in hell. I am sorry, but it is what God want [sic] me to do." (Doc. 28-7; Doc. 28-1 at ¶ 32). Embry eventually spoke with Ali by telephone on Friday evening after he had left work; during that telephone conversation, Ali terminated Embry's employment with United. (Doc. 28-1 at ¶ 29 & 33). In a December 29, 2011 email to Pankaj Khanna, United's Director of Human Resources, Ali stated Embry "was terminated for walking out of his shift without saying anything to his supervisor." (Doc. 28-7; Doc. 28-8). Nevertheless, Lacey had Embry on the schedule to work the following Monday and testified he believes, if Embry had shown up to work that following Monday, he would still be employed with United. (Doc. 41-7 at

84-86). Lacey testified he attempted to contact Embry when Embry did not show for work that Monday, but he was unable to reach Embry. (*Id.*).

On April 4, 2012, Embry filed a Charge of Discrimination with the EEOC, alleging United had engaged in religious discrimination against him. (Doc. 28-1 at ¶ 37). On June 27, 2013, the EEOC filed suit in this Court against United alleging religious discrimination under Title VII. (Doc. 1).

## III. Analysis

### A. Plaintiff's motion for summary judgment on its claim of religious discrimination under Title VII

Title VII prohibits an employer from discriminating against an employee solely because of his religious beliefs. 42 U.S.C. § 2000e-2(a)(1). In addition, Title VII imposes an affirmative obligation on an employer to attempt to reasonably accommodate an employee's religious observances or practices. Under 42 U.S.C. § 2000e(j), "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Thus, a Title VII plaintiff has two legal theories available: disparate treatment and failure to accommodate; the EEOC, on behalf of Embry, asserts both theories.

#### 1.  Plaintiff's theory of disparate treatment

To prevail under a theory of disparate treatment, the EEOC must show Embry was treated less favorably than other employees because of his religious beliefs. 42 U.S.C. § 2000e-2(a)(1). Title VII claims such as this one are evaluated using the burden-shifting method of proof developed in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Initially, the plaintiff bears the burden of establishing a *prima facie* case of discrimination. To establish a

*prima facie* case for disparate treatment, a plaintiff must show (1) he is a member of or practices a particular religion, (2) he was qualified for the job at issue, (3) he suffered an adverse employment action, and (4) someone outside the protected class was treated differently. *Gunning v. Runyon*, 3 F. Supp. 2d 1423, 1428 (S.D. Fla. 1998). The first element is the only one genuinely in dispute here.

The parties generally agree the last three elements of the *prima facie* case are met. Both parties agree Embry was qualified to work as a repair technician. (Doc. 28-1 at ¶ 12; *see also* doc. 41-7 at 84-86). United does argue, however, that Embry was not qualified to work in sales. (Doc. 41-8 at 122-25). United does not dispute that Embry's hours were reduced or that he was terminated, the two adverse employment actions the EEOC cites. (*See* doc. 39 at 34-35). United does not dispute the other employees at the Huntsville location did not experience the same reduction in hours or termination. (*See* doc. 39 at 17-18; doc. 41-8 at 120-31).

The first element of the *prima facie* case, *i.e.*, whether Embry is a member of or practices a particular religion, is disputed. Embry professes to be a practicing Seventh-day Adventist. (Doc. 28-1 at ¶ 2). He averred that his faith requires him not to work on the Sabbath—sundown on Friday until sundown on Saturday. (Doc. 28-1 at ¶ 5). United disputes this averment. Lacey testified that Embry asked to leave early one Friday in observance of the Sabbath, but Embry did not know when sunset was and could not explain the meaning of Sabbath as defined by the Seventh-day Adventists. (Doc. 41-6 at 19-21). Lacey also testified Embry worked for a nursing home on Friday evenings and Saturdays, seemingly contrary to Embry's professed religious observance of the Sabbath. (Doc. 41-6 at 23-25; doc. 41-8 at 134-39).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a

motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. The undersigned must look at the evidence in a light most favorable to the non-movant and draw all reasonable inferences in its favor. *Adickes*, 398 U.S. at 157; *Pace*, 283 F.3d at 1276-78. This would require the undersigned to assume Embry did not know and follow relevant tenants of his own professed religion, a reasonable inference from which is he does not actually practice the religion. Because resolution here will necessarily require a weighing of the evidence and an evaluation of witness credibility, summary judgment as to the disparate treatment claim would be inappropriate.

Because genuine issues of material fact remain as to the elements of the *prima facie* case, the undersigned need proceed no further in the *McDonnell Douglas* analysis. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 (11th Cir. 1989). However, even if undisputed evidence established a *prima facie* case, summary judgment still would not be proper.

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. *McDonnell Douglas*, 411 U.S. at 802. Here, United has articulated legitimate, non-discriminatory reasons for its actions. As for the reduction in hours, United stated that all repair technicians' hours were reduced after October 15 (the date a new iPhone was released) because the demand for repairs decreased dramatically. (Doc. 41-10 at 76-77; doc. 41-8 at 120-31). Embry was the only employee at the Huntsville location who worked solely as a technician; the other employees were, at least in part, in sales, so their hours were not affected as much by the decreased demand for repairs. (Doc. 41-8 at 120-31). United also stated Embry requested days off for travel and modelling competitions, was often late for work, and had to be sent home to change into appropriate attire, which also reduced the number of hours he worked. (Doc. 41-6 at 48-49; doc. 41-7 at 81-82; doc. 41-8 a 119-36). As

for Embry's termination, United stated that he "was terminated for walking out of his shift without saying anything to his supervisor." (Doc. 28-7; Doc. 28-8). According to United, Embry would have known about his schedule for Friday, December 2 by at least the Friday before, but Embry did not express any problems with the schedule (which had him on duty until after sunset) at any time prior to December 2. (Doc. 41-8 p.127-29).

The EEOC argues the proffered reasons are a pretext for unlawful discrimination. *See Tex. Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Although Embry did not notify anyone at the Huntsville location he was leaving early on Friday, December 2, he did text Ali at approximately 4 p.m. and said, "Sami. The Sabbath is very important to me. I am going to leave. It is better to follow God then [sic] to burn in hell. I am sorry, but it is what God want [sic] me to do." (Doc. 28-7; Doc. 28-1 at ¶ 32). Thus, the EEOC argues, United knew Embry left work in observance of the Sabbath and fired him for doing so. In response, United argues Ali did not know Embry was a Seventh-day Adventist and, therefore, did not understand what Embry's text message meant. (Doc. 41-7 at 67-68; doc. 41-12 at 3-4).[2]

In other words, there is a genuine dispute of material facts. Resolution will necessarily require a weighing of the evidence and an evaluation of witness credibility. "The district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the

---

[2] Although Lacey testified he knew about Embry's religion, the evidence indicates Ali made the decision to terminate Embry, (doc. 28-1 at ¶ 29 & 33), and the EEOC points to no evidence Lacey was involved in that decision. In fact, Lacey testified he had Embry on the schedule to work the following Monday and testified he believed, if Embry had shown up to work that following Monday, he would still be employed with United. (Doc. 41-7 at 84-86). The disputed evidence, taken in the light most favorable to the non-moving party, indicates Ali did not know Embry's religion, and the preferred reasons cannot be a pretext for intentional discrimination unless the decision-maker knows the employee's religion. *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("[W]hen we evaluate a charge of disparate treatment employment discrimination, we must focus on the actual knowledge and actions of the decision-maker.").

jury to assess the probative value of the evidence." *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986). In sum, even if the EEOC had established a *prima facie* case via undisputed evidence, summary judgment as to the disparate impact claim would still be inappropriate.

### 2. Plaintiff's failure to accommodate theory

Title VII requires that an employer "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977). To establish a *prima facie* case for failure to accommodate religious beliefs, a plaintiff must show (1) he had a bona fide religious belief that conflicted with an employment requirement, (2) he informed his employer of his belief, and (3) he was discharged or disciplined for not complying with the conflicting employment requirement. *Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1136 (N.D. Ala. 2011).

First, as discussed above, Embry avers he is a Seventh-day Adventist who observes Sabbath from sundown on Friday until sundown on Saturday. (Doc. 28-1 at ¶ 2 & 5). United disputes this averment, citing, among other things, Lacey's testimony Embry worked for a nursing home on Friday evenings and Saturdays, contrary to his professed religious observance of the Sabbath. (Doc. 41-6 at 23-25; doc. 41-8 at 134-39 & 147-48). Second, although it is undisputed Lacey knew about Embry's religious belief at least as early as October 14, 2011, when Embry told Lacey he could not work on Saturday, October 15, (doc. 41-6 at 19-21), it is disputed whether the decision-maker Ali, who discharged Embry, knew about his religious beliefs, (doc. 41-12 at 3-4). *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent."). As for Embry's termination, the EEOC argues Embry was terminated for not complying with an employment requirement (working past

sundown on Friday, December 2) that conflicted with his religious beliefs and observances. (Doc. 28-7; doc. 28-1 at ¶ 32). United argues, on the other hand, that he "was terminated for walking out of his shift without saying anything to his supervisor." (Doc. 28-7; doc. 28-8).

Because there are factual disputes as to the *prima facie* case, the inquiry could stop there. However, even assuming arguendo that undisputed evidence established a *prima facie* case of failure to accommodate, the defendant would then have the opportunity to demonstrate it made a reasonable accommodation or it was unable to accommodate the religious observance without undue hardship on the conduct of its business. *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 855 (11th Cir. 2010). United argues it accommodated Embry, because he was never required to work on a Saturday during his employment with United and he was allowed to leave before sunset on Fridays.[3] (Doc. 41-6 at 19-21; doc. 41-8 at 115-17, 127, & 147-49; doc. 41-9 at 150-52). Lacey testified Embry had been accommodated every time he requested it, even for days off that were not his Sabbath. (Doc. 41-7 at 98-101; doc. 41-8 at 127-29 & 147-49). Lacey also testified that, in terms of swapping schedules with other employees to accommodate Embry, the store was sales-only on Sundays and Embry was the only employee in the Huntsville store who was not cross-trained to handle sales in addition to repairs, both of which made schedule swaps challenging. (Doc. 41-8 at 121-25).

The parties disagree as to a number of material facts, the inferences that can be drawn from them, and the credibility of the various witnesses. These kinds of disputes are the province

---

[3] Though he was scheduled to work on Saturday, October 15, 2011, because United requested "all hands on deck" that day for the release of the new iPhone, after he told Lacey about his religious beliefs, he was not required to work that day and was not reprimanded for not working. (Doc. 41-8 at 115-17, 127, & 147-49; doc. 41-9 at 150-52). The EEOC argues, in response, that Embry's reduction in hours and eventual termination were punishment for his absences and early departures from work in observance of his religious beliefs. (Doc. 51 at 12 & 17-20).

of the jury and beyond the scope of the Court's review on summary judgment. In short, summary judgment on the claim for failure to accommodate would be inappropriate. *Anderson*, 477 U.S. at 255; *Lane*, 782 F.2d at 1528.

Accordingly, the EEOC is not entitled to judgment as a matter of law, and its amended motion for summary judgment is due to be **DENIED**.

## B. Plaintiff's second motion for partial summary judgment as to affirmative defenses.

The EEOC moves for partial summary judgment as to eleven of United's "affirmative defenses." (Doc. 36). While partial summary judgment may be granted as to an affirmative defense, Fed. R. Civ. P. 56(a); *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007), after reviewing United's Answer to the Complaint, the undersigned finds no stated affirmative defenses, (doc. 7). In its Answer, United has simply denied or offered statements in opposition to the numbered allegations of the Complaint, (*id.* at ¶¶ 1-23), and denied or offered arguments in opposition to the allegations of the complaint generally, (*id.* at ¶¶ 24-34). The EEOC treats these latter general arguments as affirmative defenses and argues it is entitled to summary judgment on them to the extent they are so asserted. (Doc. 36 at 17-35) (citing *Tingley*, 509 F. Supp. 2d at 1218, and *Campbell v. Robert Bosch Power Tool Corp.*, 795 F. Supp. 1093, 1098 (M.D. Ala. 1992)).

The EEOC is correct the paragraphs it cites in United's answer are arguments and not proper affirmative defenses; however, United did not designate them as affirmative defenses, (*see* doc. 7 at 24-34; doc. 36 at 2), and the EEOC provides no basis for construing them as such beyond the fact they "exceed the number of allegations in Plaintiff's Complaint," (doc. 36 at 2). The undersigned sees no reason to construe the arguments as affirmative defenses just to dismiss them not on the merits but only to the extent the Court has construed them as affirmative

14

defenses. The motion for partial summary judgment, (doc. 35), is, therefore, due to be **DENIED**.

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS**:

1. The EEOC's first motion for summary judgment, (doc. 24), be **DENIED as MOOT**, as it was superseded by the amended first motion for summary judgment, (doc. 26);

2. The EEOC's amended first motion for summary judgment, (doc. 26), should be **DENIED**, because genuine issues of material fact remain; and

3. The EEOC's second motion for partial summary judgment, (doc. 35), should be **DENIED**, because United has not stated any affirmative defenses and the arguments raised are more appropriate for trial.

## V. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal, except for plain error.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DONE this 13th day of November 2015.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE